# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME JUNIOR WASHINGTON, | ) | |
| | ) | Civil Action No. 18 – 1209 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| JOHN E. WETZEL, SGT CHESTER, | ) | |
| and GILMORE, | ) | ECF No. 64 |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Currently pending before the Court is a Motion for Summary Judgment that was filed by the Defendants on November 4, 2019. (ECF No. 64.) For the following reasons, the Motion will be granted in part and denied in part as stated in the Order that follows.

### A. Procedural History

Jerome Junior Washington ("Plaintiff") is an inmate in the custody of the Pennsylvania Department of Corrections. He initiated this case by filing a Motion for Leave to Proceed *in forma pauperis* (ECF No. 1), which was granted by the Court on October 31, 2018 (ECF No. 2). In his Complaint, which was docketed on October 31, 2018, Plaintiff alleges that Defendant Sgt.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. *See* ECF Nos. 19, 29, 90.

Chesmer[2] ("Sgt. Chesmer") used excessive force against him in relation to an incident that occurred at the State Correctional Institution at Greene ("SCI-Greene") on February 9, 2018. *See*, *generally*, (ECF No. 3.)  Additionally, for various reasons, Plaintiff alleges that Defendant John E. Wetzel ("Secretary Wetzel"), who is the Secretary of the Pennsylvania Department of Corrections, and Defendant Gilmore ("Superintendent Gilmore"), who is the Superintendent of SCI-Greene, are legally responsible for what occurred on February 9, 2018.  Id.

The Defendants waived service of the Complaint (ECF No. 18) and filed their Answer on April 2, 2019 (ECF No. 20).  Following a period of discovery, they filed a Motion for Summary Judgment (ECF No. 64), a Brief in Support thereof (ECF No. 65), a Concise Statement of Material Facts (ECF No. 66), and an Appendix thereto (ECF No. 67).  Plaintiff filed a Response in Opposition to their Motion for Summary Judgment (ECF No. 88), along with a Memorandum in Support thereof (ECF No. 89-1) and an Affidavit (ECF No. 89).  The Motion is now ripe for review.

### B.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis within).

---

[2] This Defendant's name is misspelled in the caption.  The correct spelling of his name will be used herein.

2

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joinders of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupported by admissible evidence.  FED. R. CIV. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).  Failure to properly support or contest an assertion of fact may result in the fact being

3

considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition.  FED. R. CIV. P. 56(e).

In cases where the pertinent events are captured on video, courts should not rely merely on the parties' characterizations of the events but rather should view the facts as they are depicted by the video.  Scott v. Harris, 550 U.S. 372, 380-81 (2007).  If, viewing the evidence in the light most favorable to a plaintiff, no reasonable finder of fact could view the video of the incident and determine that the defendants acted maliciously and sadistically, summary judgment is appropriate.  Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

## C.  Statement of Facts

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed unless otherwise indicated.

The underlying events in this matter took place at SCI-Greene, which is a prison maintained and operated by the Pennsylvania Department of Corrections ("DOC").  *See* (ECF No. 3, ¶¶ 2-4.)  SCI-Greene has housing units designated as the Restricted Housing Unit ("RHU").  (Affidavit of William Chesmer; ECF No. 69, ¶ 6.)  The RHU at SCI-Greene is comprised of Level 5 housing units, which are the most secured and structured housing units in the institution.  Id., ¶ 12.  Level 5 is also the highest and most secure inmate security level in the DOC.[3]  Id.

---

[3] According to the Glossary for the DOC's Reception and Classification Policy:

> Custody Level 5 – This level is assigned to those inmates who have demonstrated, through a pattern of maladjustive, assaultive behavior, or through a need for protection that they require a high degree of structure.  They require continual direct and indirect supervision by staff.  These inmates are afforded the opportunity to participate only in selected programs in his/her cell or in small, controlled, highly supervised groups on the housing unit.  They are inmates who

The Secure Residential Treatment Unit ("SRTU") is part of the RHU and it is located within B-Pod in G-Block.[4]  Id., ¶ 6.  This is also referred to as GB Unit.  *See* (ECF No. 3, ¶ 7.)  According to the DOC's Access to Mental Health Care Procedures Manual Policy:

> [t]he Secure Residential Treatment Unit (SRTU) is designated to provide management, programming, and treatment for an inmate who exhibits Serious Mental Illness (SMI), chronic disciplinary issues, and demonstrates an inability to adapt to a general population setting.  This is a secure diversionary unit for mentally ill inmates who do not currently meet commitment criteria according to the Pennsylvania Mental Health Procedures Act and require a secure setting due to their demonstrated problematic behavior in less secure environments.  The unit is intended to provide focused staff interaction, programming, and treatment for this select inmate population.  The focus of the SRTU is to convey sufficient skills in behavioral control, coping, and compliance with recommended treatment.

(Policy No. 13.8.1, Access to Mental Health Care; ECF No. 67-1, p.29.)

Plaintiff was transferred to SCI-Greene on or about July 13, 2016.  (Inmate Query – Cell History; ECF No. 67-1, p.3.)  In February 2018, Plaintiff was confined in GB Unit in the SRTU

---

either would pose a high level of risk to others or may be at risk themselves if permitted access to general population areas.  When out of his/her cell, he/she is always under escort, except as otherwise permitted by the Program Review Committee.  They receive visits only in the housing unit, or designated secure areas and the visits are non-contact.  Custody level 5 is the most restrictive level and inmates assigned to this level should be housed in units with a security level rating of 5.

(Policy No. 11.2.1, Reception and Classification; ECF No. 67-1, p.14.)

[4] G-Block consist of four separate pods, all connected by a central hub.  (ECF No. 69, ¶ 7.)  Each pod contains 24 cells along the outside walls on two levels and a common area in front of the cells, often referred to as the day room.  Id., ¶ 8.  In the day room of B-Pod are several metal tables with built-in benches and the tables are secured to the floor.  Id.  The first level of the hub houses offices for the Block Sergeant and the Unit Manager, as well as entrances to each of the four housing pods.  Id., ¶ 9.  There is also an Armory near the door to B-Pod, which holds tools and equipment, including canisters of oleoresin capsicum ("OC") spray.  Id., ¶ 10.  The second level of the hub contains a control bubble, which overlooks each of the four separate housing units.  Id., ¶ 11.

at SCI-Greene.  Id., p.4.  At this time, Sgt. Chesmer was employed as a Corrections Officer II ("Sergeant") at SCI-Greene and was assigned as a Relief Sergeant for the 0600-1400 (6:00 am to 2:00 pm) shift.[5]  (ECF No. 69, ¶¶ 2, 23.)  As a Relief Sergeant, Sgt. Chesmer was assigned to a variety of posts throughout the facility as a fill-in for a regularly assigned Sergeant.  Id.  On February 9, 2018, Sgt. Chesmer was assigned as relief for the Block Sergeant on G-Block, and, as such, he was generally responsible for supervision of inmates participating in work, leisure activities, formal programs, etc., as well as the exercise of care, custody and control over inmates in the housing unit.  Id., ¶¶ 24, 25.  The regularly assigned RHU Lieutenant for G-Block was off that day, but the position was covered by the F-Block RHU Lieutenant, Lt. Trout.  Id., ¶ 26.

On February 9, 2018, Sgt. Chesmer was in the G-Block hub preparing for the upcoming shift change at 1400 hours (2:00 pm).  Id., ¶ 27.  A number of inmates, including Plaintiff, were in the GB Unit day room, participating in out-of-cell group activity led by Jeff Bowden, a Psychological Services Specialist.  Id., ¶ 28.  Plaintiff was seated at a table with two other inmates, and all three were in handcuffs that were secured to the table.  Id.  Because of the number of inmates out of cell at that time, this was considered a "major line movement" within the Level 5 housing unit.  Id., ¶ 29.

At approximately 1240 (12:40 pm), Sgt. Chesmer was alerted to a disturbance in the SRTU, although he cannot recall if the call came from the pod officer on GB Unit or the control officer in the bubble overlooking the pod.  Id., ¶ 30.  It was reported that inmates were attempting to slip or pull out of their hand restraints.  Id.  While Sgt. Chesmer would generally only carry a radio and set of handcuffs on his person, he secured a can of OC spray from the

---

[5] Sgt. Chesmer retired from the DOC in February 2019.  (ECF No. 69, ¶ 1.)

Armory before entering GB Unit because it was considered a major line movement and he was unsure of what he would encounter inside the pod.  Id., ¶ 31.

When Sgt. Chesmer entered GB Unit, he observed three inmates, including Plaintiff, at the table nearest the door.  Id., ¶ 32.  As an exhibit in support of their Motion for Summary Judgment, Defendants submitted the video surveillance from a fixed camera in the GB day room.  (February 9, 2018 Video Surveillance from Camera GB Dayroom; ECF No. 67-2.)  The video depicts the inmates in the day room and the events that subsequently unfolded when Sgt. Chesmer entered, but there is no sound and the parties' versions as to what was allegedly said during the incident appear to be in dispute.  Visually, however, the video depicts the following events.

| | |
|---|---|
| 12:41:00 | Seven inmates are observed at various tables in the day room. Four inmates are sitting alone at four separate tables.  Three inmates, including Plaintiff, are observed at a table in the middle. The two inmates who are at the table with Plaintiff are standing while Plaintiff is sitting.  All inmates are visibly secured to the tables by hand and leg restraints.  One inmate ("Inmate 1"), who is to the left of Plaintiff at his table, is standing and then leans against the table.  The other inmate who is to the right of Plaintiff at his table ("Inmate 2") is standing with his back facing the camera before turning to sit on top of the table.  Plaintiff is observed sitting at the table and it is unclear what, if anything, he is doing with his hands.  The hands from the other inmates in the room are not visible or clear on the video.  Jeff Bowden, a Psychological Services Specialist who led the out-of-cell group activity that was taking place at that time, is observed casually walking about and talking to the inmates. |
| 12:41:25 | Jeff Bowden goes off camera. |
| 12:41:45 | Inmate 1 gets up from the table and remains standing and talking to the other inmates. |
| 12:41:54 | Jeff Bowden reenters the camera's view and casually walks and talks amongst the inmates.  Eventually Inmate 2 stands up at the table. |

7

12:43:48       Sgt. Chesmer and four other guards appear on screen in the day
               room.  Sgt. Chesmer is observed holding a canister in his right
               hand.  Sgt. Chesmer approaches the table with Plaintiff, Inmate 1
               and Inmate 2, and he and one of the other guards begin to speak
               directly with Inmate 2, on Plaintiff's right.  Another guard is
               observed speaking directly with Inmate 1, on Plaintiff's left.
               Plaintiff is observed sitting at the table but is not directly addressed
               by any of the guards who are present, although he does appear to
               be listening to what is being said between Sgt. Chesmer and
               Inmate 2.

12:44:23       Plaintiff appears to say something to Sgt. Chesmer and the other
               guard who are speaking to Inmate 2.  A conversation then appears
               to ensue between Plaintiff and Sgt. Chesmer while Plaintiff is still
               sitting down at the table.

12:44:37       While speaking to Sgt. Chesmer, Plaintiff appears to get agitated
               and stands up from his seat at the table.  He then appears to very
               quickly pull at each of his wrists and/or hand restraints, although
               again, due to the quality of the video, it is unclear what he is doing.

12:44:44       Plaintiff makes what appears to be a quick pelvic thrust move
               while he is speaking with Sgt. Chesmer.

12:44:45       Sgt. Chesmer deploys OC spray towards Plaintiff's face.  It
               appears that he is standing approximately five or six feet away
               from Plaintiff when the OC spray is deployed.

12:44:47       Sgt. Chesmer stops the deployment of OC spray.  The other
               inmates are observed turning away from the area of the spray.

12:44:49       Agitated, Plaintiff takes the papers that are sitting at the table in
               front of him and throws them across the table toward Sgt. Chesmer
               and the other guards.

12:44:52       Plaintiff tries to pull himself away from the table and appears to try
               and kick Sgt. Chesmer, who is out of reach.  Some of the guards
               begin to leave the day room and/or the view of the camera.

12:44:59       While facing Sgt. Chesmer, Plaintiff reaches into his pants and
               pulls his penis from his pants.

| 12:45:02 | Sgt. Chesmer again deploys OC spray towards Plaintiff's face.  It appears that he is standing approximately six to eight feet away from Plaintiff when the OC spray is deployed. |
|---|---|
| 12:45:03 | Sgt. Chesmer stops the deployment of OC spray.  He and the remaining guards then leave the day room and/or the view of the camera.  All of the inmates except for Plaintiff are observed at their tables turned and hunched over trying to avoid the spray.  Plaintiff is still agitated and observed trying to pull away from the table. |
| 12:47:15 | Guards wearing masks enter the day room and start removing inmates from the tables and returning them to their cells. |
| 12:53:00 | The last of the four inmates who are at the individual tables are removed. |
| 13:15:11 | A three man CERT team enters, covers Inmate 2 with a spit mask and removes him from the table and out of the day room. |
| 13:24:00 | The three man CERT team returns, covers Inmate 1 with a spit mask and removes him from the table and out of the day room. |
| 13:32:10 | The three man CERT team returns and covers Plaintiff with a spit mask.  However, there appears to be some complication removing Plaintiff's hand restraints from the table requiring that they eventually be cut off.  As such, he is not removed from the table and out of the day room until 13:43:40 (1:43 pm), over ten minutes after they come in to get him. |

(February 9, 2018 Video Surveillance from Camera GB Dayroom; ECF No. 67-2.)

As noted above, the video does not contain sound and the parties appear to dispute what was said during the incident and the reasons why the OC was deployed.

According to Sgt. Chesmer, he recognized one of the inmates sitting at Plaintiff's table (either Inmate 1 or Inmate 2) as an inmate with whom he thought he had a rapport.  (ECF No. 69, ¶ 33.)  He believed that if he could get this inmate to calm down and return to his cell then it could help defuse the situation with all the other inmates.  Id.  He then advised the inmates that the day room was being terminated and that the inmates would be returned to their cells.  Id.  Sgt.

Chesmer maintains that as he was speaking with this inmate, Plaintiff became belligerent, making threats and being generally combative and unruly.  Id., ¶ 34.  He directed Plaintiff to calm down and stop pulling at his restraints, but Plaintiff stood up and became more aggressive, pulling at his handcuffs in what he believed to be an apparent attempt to separate them from the table or to pull his hands out of the restraints.  Id., ¶ 35.  He maintains that it was his belief that Plaintiff was attempting to pull out of his restraints so that he could potentially assault him, another inmate or other DOC staff.  Id.  He states that while Plaintiff was attempting to get loose from his restraints, Plaintiff appeared to want to spit on him, and, it was at that point that he deployed the OC spray.  Id., ¶ 36.  Sgt. Chesmer further maintains that after deploying the OC spray, he ordered Plaintiff to take his seat so that he could be returned to his cell.  Id., ¶ 37.  Plaintiff refused the order and then pulled his penis from his pants.  Id.  Sgt. Chesmer says that Plaintiff appeared to attempt to urinate on him, so in response he deployed the OC spray for a second time.  Id.  He then ordered all DOC staff off the pod to wait for the OC to take effect on Plaintiff and directed that the ventilation fans be turned on to dissipate the OC in the air.  Id., ¶¶ 38-39.  His involvement in the incident ended when Lt. Trout took over as the officer-in-charge.  Id., ¶ 40.

Plaintiff disputes Sgt. Chesmer's version of events, and, while he seemingly provides two different versions of the exchange that allegedly took place that day, he maintains in both that Sgt. Chesmer had already planned to spray him when he first came onto the day room and that there was no reason to do so since he was handcuffed and shackled to the table.  According to Plaintiff's first version, Sgt. Chesmer told Plaintiff to "shut the fuck up" before he sprayed him.  In response, Plaintiff said, "I remember you[.]  [Y]ou are the same Sgt. that l[i]e on me in your misconduct saying that I show[ed] the Unit Manager Lackey my dick wh[ile] I was in the shower

10

taking it hostage and you gave me several orders to be removed from the shower when I've never even seen you to write me up[.]  [S]o you are a l[ia]r."  Sgt. Chesmer then said, "Didn't I tell you to shut the fuck up and s[i]t the fuck down before I spray your ass[?]"  Plaintiff then said, "See yall always come on the block trying to [intimidate] us inmates by coming on the block with your can[] of spray already drawn trying to[] scare us with threats and the planned use of force."  Plaintiff states that at that point Sgt. Chesmer deployed the OC spray in his face at "close range" and that made him "mad and frust[r]ated".  In response, Plaintiff said, "You mother fuckers always trying to spray inmates when they are handcuffed up to the table just like you l[i]e on my misconduct saying that I've shown Lackey my dick and telling Lackey to suck my dick which is all lies.  But[,] since you want to l[i]e on me and then spray me out of retaliation wh[ile] I'm handcuffed up to the table now I am going to tell you to suck my dick."  That's when Plaintiff pulled out his penis and admittedly told Sgt. Chesmer to "suck" it.  Plaintiff maintains that Sgt. Chesmer sprayed him again with the OC spray but this time he "empt[ied] the rest of the big can[]".  (ECF No. 3, ¶ 42.)

According to Plaintiff's second version of events, Sgt Chesmer came running over to the table with the can of OC spray "drawn."  He then went beside one of the inmates and threatened to spray him if he didn't go back to his cell.  When Plaintiff told Sgt. Chesmer that they were not doing anything but participating in group, Sgt. Chesmer told Plaintiff to "sit the fuck down before I spray your ass."  Plaintiff told Sgt. Chesmer not to talk to him like that and that he couldn't spray them because they weren't doing anything.  Sgt. Chesmer then said, "Oh, you are a tuff (sic) guy that I see I am going to have to fuck up."  Plaintiff then told another guard who was present to take him out of the handcuffs since Sgt. Chesmer wanted to fight.  He also said, "Don't try to beat me in handcuffs like yall always do."  Sgt. Chesmer said that Plaintiff was

"just a pussy bitch ass rapist who raped a little girl and her mother" and told him that he couldn't fight because he was a "little bitch."  Plaintiff then told him "fuck you, I can fight, I can beat your ass" and "if I wasn't in these handcuffs then we would see who the tuff (sic) guy is."  Sgt. Chesmer told Plaintiff "fuck you, bitch, you rapist," and Plaintiff said "yea, just like you lied on a misconduct . . . saying that I show[ed] the Unit Manager my dick and mast[u]rbating to the Unit Manager while I was in the shower[.]  You are a fucking li[a]r."  Sgt. Chesmer then said, "fuck you bitch" before he deployed the OC spray "for a long period of time".  In response, Plaintiff pulled out his penis and told Sgt. Chesmer to "suck my dick" before Sgt. Chesmer "empt[ied] the rest" of the can of OC spray into Plaintiff's face at "close range."  (ECF No. 89, ¶ 18.)

A DC-121 Extraordinary Occurrence Report ("EOR") was prepared following this incident.  (EOR; ECF No. 67-2.)  The EOR contains Employee Reports of Incident by the following DOC individuals:  Sgt. Chesmer (id., pp.35-36), Jeffrey Bowden (id., pp.37-38), Lt. Hayes (id., pp.39-40), Lt. Trout (id., pp.41-42), CO Kulik (id., pp.43-44), CO Wintermyer (id., pp.45-46), CO Greenawalt (id., pp.47-48), CO Perez (id., pp.49-50), and CO Colgon (id., pp.51-52).[6]  Of the individuals who provided reports, only Jeff Bowden and CO Colgan were present and observed the incident with Sgt. Chesmer despite the fact that there appeared to be at least three other guards on camera in the day room who likely observed what happened.[7]  However, both Jeff Bowden and CO Colgan at least somewhat corroborated Sgt. Chesmer's account of

---

[6] The EOR also contains a Medical Incident/Injury Report for Plaintiff (id., pp.56-57) along with pictures taken of Plaintiff, Inmate 1 and Inmate 2 by the nurse in the triage immediately after they were taken out of the day room by the three man CERT team (id., pp. 60-71.)

[7] The rest of the individuals who provided reports were involved only to the extent that they participated in the removal of the inmates after the incident was over.

what happened in that Bowden wrote that Plaintiff "attempted to slip his restraints and appeared to try and spit on Sgt. Chesmer" (id., p.37) and CO Colgan wrote that Plaintiff tried "to get out of his restraints, cursing towards staff, and threated to start spitting" (id., p.51).  The EOR also contains a SRTU Accountability Status Restriction Form for Plaintiff that was completed by his Unit Manager Candice Lackey who, despite not observing the incident, wrote that Plaintiff did "spit at Sgt. [Chesmer]."  Id., p.53.  Interestingly, however, the EOR also contains a written note by Michael Zaken, the Deputy Superintendent of Facility Management ("DSFM") at SCI-Greene, who reviewed the video surveillance footage and noted that the "initial use of OC by Sgt. Chesmer is borderline especially with MK9."[8]  Id., p.34.  He stated that Sgt. Chesmer's written justification, which was "inmate appeared to want to spit," was "weak" although the video did "support inmate not being compliant and pulling at restraints."  Id.  He recommended that the "video be reviewed by Capt. Crumb with officers involved to review better options, first being to contact commissioned officer immediately."  Id.

Per the DOC's Use of Force policy,

A. Use of force against an inmate is authorized when the acting staff member reasonably believes such force is necessary to accomplish any of the following objectives:

   1. protection of self or others;

   2. protection of property from damage or destruction;

   3. prevention of an escape;

   4. recapture of an escapee;

   5. prevention of an act of crime;

---

[8] It is believed that "MK9" refers to the large canister of OC that was used by Sgt. Chesmer, which was labeled as "Mark 9".  (ECF No. 69, ¶ 31.)

6. effect compliance with the rules and regulations when other methods of control are ineffective or insufficient; and/or

7. protection of the inmate from self-inflicted harm.

B. When force is used, the least amount of force the staff member reasonably believes is necessary to achieve the authorized purpose is to be used and the use of force will stop once control is achieved.

C. Use of force shall be applied in accordance with the force continuum, as defined in ***the Glossary of Terms for this procedural manual***, unless the acting staff member reasonably believes the situation requires immediate escalation to a greater degree of force to accomplish any of the objectives identified in this policy and procedures manual.

(Use of Force Policy, DC-ADM 201; ECF No. 67-2, pp.9-10.)  As noted above, any use of force shall be applied in accordance with the force continuum, which describes a sequential order of force beginning with the least amount of force and progressing through the degrees of non-deadly and deadly force.  It is comprised of the following components:

1. show of force;

2. control techniques, oleoresin capsicum, Electronic Body Immobilizing Device (EBID), and/or Pepperball System*

3. chemical munitions other than oleoresin capsicum;

4. active counter measures (strikes against the inmate) and/or Specialty Impact Munitions (SIM)*; and

5. firearms.

*These options are equivalent methods of control, subject to availability under the circumstances.

Id., p.18.  According to Sgt. Chesmer, "when an inmate is acting out and refuses to comply with direct orders, the inmate is initially given direct orders to stop any aggressive actions or conduct, in the physical presence of at least one corrections officer.  This is a show of force."  (ECF No. 69, ¶ 20.)  He states that "[i]f the inmate fails to comply, he is then advised that OC spray will be

14

deployed to gain his compliance.  This is an equivalent method of the next level on the force continuum.  The inmate will then be given a final direct order.  If he does not comply, then the OC spray will be deployed." Id., ¶ 21.  Sgt. Chesmer maintains that he received training on working in the RHU and with Level 5 inmates, and, in February of 2018, he was qualified to work in any RHU or Level 5 housing unit.  Id., ¶ 14.  He also states that he received training from the DOC on use of force.  Id., ¶ 15.

### D.  Discussion

#### 1.  Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), inmates must exhaust their administrative remedies before filing a suit alleging specific acts of unconstitutional conduct by prison officials.  42 U.S.C. § 1997e(a).  Additionally, "[p]roper exhaustion of administrative remedies is necessary" to satisfy the PLRA's exhaustion requirement.  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  In order to properly exhaust, inmates must complete the administrative review process in accordance with the applicable procedural rules of the prison grievance procedure.  Jones v. Bock, 549 U.S. 199 (2007).  Relevant here, the Pennsylvania DOC requires three stages of review to exhaust administrative remedies, including an initial written grievance, an appeal to the Facility Manager, and a final written appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  See (Inmate Grievance System, DC-ADM 804; ECF No. 67-3, pp.1-36); see also 37 Pa. Code § 93.9.

Relative to this case, Plaintiff did file a grievance relating to the use of OC spray by Sgt. Chesmer on February 9, 2018 (Grievance No. 720878), and he pursued this grievance through all three steps of the DOC's grievance review process.  See (Inmate Grievance No. 720878; ECF No. 67-3, pp.50-57.)  In Grievance No. 720878, Plaintiff argued that Sgt. Chesmer planned to

15

use excessive force against him as evidenced by the fact that he ran onto GB Unit with the can of OC spray "drawn" and "ready to spray".  He also complained that Sgt. Chesmer was "not train[ed][,] prepared[,] or not ready to put an after plan together after the planned use of force or excessive mace was used." Id., p.51.  His claim of excessive force was found to have no merit and this response was upheld at both appeal levels. Id., pp.52-53, 56, 57.  Thus, Plaintiff exhausted his excessive force claim against Sgt. Chesmer.  However, neither Secretary Wetzel nor Superintendent Gilmore were named or identified in Grievance No. 720878, and a review of the grievance itself, as well as Plaintiff's grievance records, reveals that Plaintiff did not make any allegations of wrongdoing against either one of them with respect to the events surrounding the use of OC spray by Sgt. Chesmer on February 9, 2018.  Accordingly, Plaintiff failed to exhaust his administrative remedies with respect to the claims that he makes in his Complaint against Secretary Wetzel and Superintendent Gilmore.  As such, both Secretary Wetzel and Superintendent Gilmore are entitled to summary judgment.  Alternatively, and notwithstanding Plaintiff's failure to exhaust his administrative remedies with respect to Secretary Wetzel and Superintendent Gilmore, both Defendants are entitled to summary judgment because he has failed to adequately allege their personal involvement in the asserted violations of his rights. See, D.2., infra.

At this point the Court notes that counsel for Defendants puts forth an argument that Plaintiff failed to properly exhaust any claim that he may be asserting with regard to his cell assignment immediately following the incident with Sgt. Chesmer on February 9, 2018.  In this regard, Plaintiff makes several allegations in his Complaint concerning his placement in unsanitary cells.  He alleges that the first cell he was placed in, GB02, had blood on the floor, and that he was in that cell for one day before he was moved to another cell, GB01, that had

feces on the window. *See* (ECF No. 3, ¶ 39.)  He does not state for how long he was in cell GB01, but, according to his Cell History, which the Defendants submitted in support of their Motion for Summary Judgment, Plaintiff was in cell GB01 for approximately one hour (2/11/2018 23:11 to 2/11/2018 00:37) before he was assigned to cell GB05, where he remained until March 27, 2018.  (ECF No. 67-1, p.4.)  Plaintiff alleges that he was put in these cells by "Captain Crum", "Unit Manager Lackey" and "Psychiatrist Burger" as punishment for what happened with Sgt. Chesmer.  (ECF No. 3, ¶ 39.)

While Defendants maintain that on February 11, 2018, Plaintiff did file a grievance concerning his cell assignment, and Plaintiff pursued the grievance through all three steps of the grievances process, Plaintiff nevertheless failed to properly grieve his complaints about his cell assignment because the grievance was dismissed at the final appeal level for Plaintiff's failure to include all necessary documents.  *See* (Inmate Grievance No. 720882; ECF No. 67-3, pp.58-64.) However, the Court notes that none of the individuals whom Plaintiff maintains were responsible for his cell placement are named defendants in this case and it does not appear that he intended them to be defendants in this case.  Furthermore, it appears that Plaintiff's claims about his cell placement after the incident with Sgt. Chesmer, at least insofar as they pertain to Unit Manager Lackey, are a part of Plaintiff's case at Civil Action No. 18-1390, which is currently pending in this Court.  Therefore, the Court will reserve ruling on the issue of whether Plaintiff properly grieved his complaints with regard to his cell placement for if and when the issue is raised again in Civil Action No. 18-1390.

### 2. <u>Personal Involvement of Secretary Wetzel and Superintendent Gilmore</u>

It is well settled that a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat*

*superior*."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981) (other citation omitted)); *see also* C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing C.H. v. Oliva, 226 F.3d 198, 201–02 (3d Cir. 2000) (en banc)).  These allegations "must be made with appropriate particularity."  Id.  *See also* Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Santiago v. Warminster Twp., 629 F. 3d 121, 130 (3d Cir. 2010) (quoting Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000)) ("Particularly after *Iqbal*, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to 'demonstrate a 'plausible nexus' or 'affirmative link' between the [directions] and the specific deprivation of constitutional rights at issue.'").

The Third Circuit Court of Appeals has identified two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates.  First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).  Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct.  Id. (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)).

With respect to Secretary Wetzel, Plaintiff alleges that he is "legally responsible for the overall operation of the Department and each institution under it(s) jurisdiction; including SCI-Greene prison and it(s) agency including the Plaintiff . . . ."  (ECF No. 3, ¶ 58.)  He further alleges that

> Defendant John E. Wetzel is being sued for Plaintiff issues from 1 through 58 and below complaints made into this civil action for the breach and failure of ones duty and the violation(s) of the 8th and 14th Amendment(s) right(s) to my constitutional law(s) and prisoners right to be free from cruel and unusual punishment and excessive force DC-ADM 001 assaultive and battery act upon chemical agent(s), used intentionally to cause harm, pain and suffer to the Plaintiff medical injuries cataract and glaucoma but the planned use of force that became excessive force DC-ADM 001 policy.  Violation to my constitutional rights and laws.  That occurrence under John E. Wetzel overall protection and case were to John E. Wetzel receive(s) an copy of all prison complaints including inmate(s) grievances under DC-ADM 804 policy and systematic tracting grievance system. . .

> Defendant John E. Wetzel had turn an blind eye on Sgt. Chesmer assault and battery excessive force DC-ADM 001 policy on 2-9-2018 event of.

> Defendant John E. Wetzel turning an blind eye with the assumption(s) that it is okay for Sgt. Chesmer to plan the use of force and use chemical agents close range on 2-9-18 spraying Mr. Washington HV0280 right in the face and leaving him cuffed up to GB Unit tables four pointed down with four different hand cuffs to GB Unit table for around an hour and a half.  Blind by chemical(s) and burning in flam(s) and conflicted pain and suffering.

> Defendant John E. Wetzel is turning a blind eye upon the acknowledgment or assumption that his agent(s) can get away with placing Mr. Washington in a bloody cell [GB02 cell] on 2-9-18 and an hazardously contaminated cell [GB01 cell] on 2-10-18 within fece(s) inputted on GB01 cell window were food have to be served or the outside filthy trash hazard and safety risk to ones health from the pollution behind an unwatched out of view placement behind an brick wall out of sight and out of mind were to an suicidal risk of placing an suicidal ideation mental health patient like Mr. Washington behind an wall without supervision or an prison official watching the surveillance cameras in GB Unit bubble etc . . .

(ECF No. 3, ¶ 59.)

With respect to Superintendent Gilmore, Plaintiff alleges that "he is legally responsible for the operation of SCI-Greene . . . SRTU-program . . . as the overseer and hold the custody care and control for the welfare and protection over all inmates under . . . SCI-Greene's prison and its SRTU-program . . . and its prison officials . . ." (ECF No. 3, ¶ 3.)  He further alleges that

> Defendant Superintendent Gilmore had fault to protect me from harm and cruel and unusual punishment under Gilmore overall custody care and control wereto Gilmore ignorance of turning the blind eye on SCI-Greene's SRTU Program inmates pain and suffering by Gilmore's assumption that we are mental health prisoner and don't have no equal right to be treated as human being under his supervision racial program act and torturous control compelling slavery by force just like on 2-9-18 assaultive and battery act wereas Gilmore's assumption is as long as his prison officials don't get cotch on camera assaulting inmate's it's okay or if they shall assault inmates without an security camera present its okay or if prison official don't follow 13.8.1 policy and practices by law and procedure it's okay too violate prisoner's right's that are mental health because they can not provide help or tell what the cameras don't see or social society civilian or citizen's cannot bear witness or see it would be okay maybe the superintendent/warden Gilmore assumption that why it's okay under his custody control and care its okay to assault and harm inmates continuously on an basic excessive force DC-ADM 001 assaultive and battery act of slavery. .

(ECF No. 3, ¶ 40.)

There are no allegations in the Complaint that Secretary Wetzel or Superintendent Gilmore participated in the incident that occurred on February 9, 2018, nor are there allegations that they either personally directed Sgt. Chesmer or had actual knowledge and acquiesced in Sgt. Chesmer's use of force against Plaintiff.  Moreover, as difficult as it is to comprehend, the Complaint does not contain any allegations that either Secretary Wetzel or Superintendent Gilmore personally established and maintained a policy, practice or custom *that caused the constitutional harm at issue herein*.  Importantly, while Plaintiff does allege that these defendants are responsible for establishing and/or maintaining DOC policy, Plaintiff's entire case is premised on his belief that Sgt. Chesmer was *not* acting according to policy when he sprayed

Plaintiff with the OC spray on February 9, 2018.  And, to the extent that Plaintiff is, instead, alleging that it is the practice or custom of these Defendants to "turn a blind eye" to the actions by their employees that do not comply with DOC policy, such allegations are insufficient to show that either Secretary Wetzel or Superintendent Gilmore had any personal knowledge or involvement in the incident that took place with Sgt. Chesmer on February 9, 2018.  *See*, *e.g.*, McAllister v. Wiekl, No. 1:12-CV-2273, 2014 WL 795084, at *5 (M.D. Pa. Feb. 27, 2014). Finally, as previously noted, Plaintiff cannot hold Secretary Wetzel and Superintendent Gilmore liable for the acts of Sgt. Chesmer simply based on their respective positions with the DOC, as this is not a proper basis to establish liability against a defendant in a section 1983 action. Accordingly, even assuming Plaintiff had exhausted his administrative remedies against these two Defendants, which he did not, they are entitled to summary judgment on this alternative basis.

### 3.   <u>Claims against the Defendants in their Official Capacities and for Injunctive Relief</u>

Insofar as Plaintiff is suing the Defendants in their official capacities, *see* (ECF No. 3, caption & ¶¶ 5, 58), they are entitled to immunity pursuant to the Eleventh Amendment.

As an initial matter, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citation omitted).  In this case, Defendants are employees of the Pennsylvania DOC, and, as such, a suit against them in their official capacities is really a suit against the Pennsylvania DOC and is no different from a suit against the Commonwealth of Pennsylvania.

The Eleventh Amendment provides states with immunity not only from suits brought by citizens of other states, but also from suits brought by their own citizens. <u>Hans v. Louisiana</u>, 134 U.S. 1, 12-14 (1890). However, a state's Eleventh Amendment protection from federal suits is not absolute. Congress may authorize such a suit under its power to enforce the Fourteenth Amendment, <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 670 (1999), thereby abrogating a state's sovereign immunity but only "when it both unequivocally intends to do so and 'acts pursuant to a valid grant of constitutional authority,'" <u>Bd. of Trs. Of the Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 363 (2001) (quoting <u>Kimel v. Bd. of Regents</u>, 528 U.S. 62, 73 (2000). A state may also waive its sovereign immunity by consenting to suit. <u>Coll. Sav. Bank</u>, 527 U.S. at 670 (citing <u>Clark v. Barnard</u>, 108 U.S. 436 (1883)); <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 238 (1985). Additionally, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of <u>Ex parte Young</u>, 209 U.S. 123, 159-60 (1908), despite the text of the Eleventh Amendment. <u>Alden v. Maine</u>, 527 U.S. 706, 757 (1999).

By statute, the Commonwealth of Pennsylvania has specifically withheld its consent to be sued. *See* 42 Pa. C.S.A. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *see also* <u>Laskaris v. Thornburgh</u>, 661 F.2d 23, 25 (3d Cir. 1981). Additionally, Congress has not expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages. *See, e.g.*, <u>Will</u>, 491 U.S. at 66 ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); <u>Quern v. Jordan</u>, 440 U.S. 332, 341 (1979);

Boykin v. Bloomsburg Univ. of Pa., 893 F. Supp. 378 (M.D. Pa. 1995) (holding that States' immunity has not been abrogated for actions brought under §§ 1981, 1983, 1985, and 1986), *aff'd*, 91 F.3d 122 (3d Cir. 1996).

As noted by Plaintiff in his Complaint, he is seeking some forms of injunctive relief, *see* (ECF No. 3, ¶¶ 44-46), and therefore he maintains that Defendants are not entitled to immunity in their official capacities.  Nevertheless, to plead a cause of action under Ex parte Young, a plaintiff must establish a present violation of federal law.  *See* B.H. Papasan v. Allain, 478 U.S. 265, 278 (1986) (Ex parte Young applies to those cases in which a violation of federal law is ongoing, not to those in which federal law was violated in the past); Milliken v. Bradley, 433 U.S. 267, 289-90 (1977) (Ex parte Young applied to defendants perpetuating a system of *de jure* segregation at the time the suit was filed).  In this case, the alleged violation of federal law is not ongoing, and, consequently Ex parte Young is inapplicable.  Thus, the Defendants are entitled to summary judgment to the extent Plaintiff has sued them in their official capacities.

### 4.  **Fourteenth Amendment Due Process Claim**

In his Complaint, Plaintiff purports to assert a claim under the Fourteenth Amendment. *See* (ECF No. 3, ¶¶ 5, 41, 59.)  However, other than identifying the Fourteenth Amendment and including the term "due process," it does not appear that Plaintiff makes any specific allegations in support of an independent Fourteenth Amendment violation claim.

Although Plaintiff fails to clarify his reference to the Fourteenth Amendment in his response in opposition to Defendants' Motion for Summary Judgment, it may be that Plaintiff's reference to the Fourteenth Amendment is merely an acknowledgement that the Eighth Amendment standards are made applicable to the State's through the Fourteenth Amendment's due process clause.  *See* Estelle v. Gamble, 429 U.S. 97, 101-02 (1976) (citing Robinson v.

California, 370 U.S. 660 (1962)).  Indeed, the standards of the Eighth Amendment barring the federal government from inflicting cruel and unusual punishments are the standards applicable to the States through incorporation by the Fourteenth Amendment's due process clause.  *See* Sistrunk v. Lyons, 646 F.2d 64, 66-67 (3d Cir.1981) (citing Robinson v. California). Furthermore, the standards under the Eighth Amendment and the standards under the Fourteenth Amendment are fundamentally identical.  Furman v. Georgia, 408 U.S. 238, 422 n.4 (1972) (Blackmun, J., dissenting) ("the tests for applying these two provisions are fundamentally identical."); Berry v. City of Muskogee, 900 F.2d 1489, 1494 n.6 (10th Cir.1990).

However, even if Plaintiff were attempting to make an independent claim under the substantive due process clause, asserting that the Defendants' actions were arbitrary and capricious, in addition to his Eighth Amendment claim of cruel and unusual punishment, such an independent substantive due process claim would be barred by the cases of Albright v. Oliver, 510 U.S. 266, 273 (1994) and Graham v. Connor, 490 U.S. 386 (1989).  Both cases hold that where there is an explicit textual source and standard for constitutional protections against a specific factual situation, such as the Eighth Amendment standards protecting against the infliction of cruel and unusual punishment, then that standard applies and supplants any other more amorphous standard under the Fourteenth Amendment's substantive due process clause. As such, Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim to the extent any such claim has been advanced in this case.

### 5.  Eighth Amendment Excessive Force Claim

Plaintiff's final claim is that Sgt. Chesmer violated the Eighth Amendment when he twice deployed the OC spray on February 9, 2018, while he was handcuffed and shackled to a table.

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000). In determining whether a prison official has used excessive force in violation of the Eighth Amendment, the "pivotal inquiry" is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). Summary judgment in favor of a defendant is not appropriate if "it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Id. at 322.

In determining whether a defendant has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them"; and (5) "any efforts to temper the severity of a forceful response." Id. at 321. Consideration of these factors ("Whitley factors") permit a court to make inferences concerning "whether the use of force could plausibly have been thought necessary" or whether the circumstances show "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Id.

Before beginning inquiry into the above referenced Whitley factors, counsel for Defendants maintains that there are no real factual disputes regarding Sgt. Chesmer's deployment of the OC spray against Plaintiff because there is a video of the incident that is part of the summary judgment record. That is correct to the extent that the video clearly shows, and

25

the parties do not dispute, that OC spray was twice deployed by Sgt. Chesmer and that it was deployed while Plaintiff was handcuffed and shackled to a table in the day room.  However, as previously noted, the video's quality is subpar, it does not contain any sound, and the parties disagree as to what was said during the incident that may have caused Sgt. Chesmer to use the OC spray.

Addressing the first two Whitley factors, the Court first notes that the Third Circuit Court of Appeals has stated that the "use of tear gas is not 'a per se violation of the Eighth Amendment . . . .'" Passmore v. Ianello, 528 F. App'x 144, 147 (3d Cir. 2013) (quoting Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984)).  "Rather, '[t]he use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and unusual punishment.'" Id. (quoting Soto, 744 F.2d at 1270).  Here, Sgt. Chesmer maintains that he was called into a situation where a number of inmates, including Plaintiff, were reportedly attempting to manipulate their hand restraints.  He claims that Plaintiff initially interfered with his efforts to regain control of the situation by yelling at him and making verbal threats, and he also claims that Plaintiff was also actively and aggressively trying to break free from his restraints and ignored direct orders to stop and sit down so that he could be returned to his cell.  Beyond this, in the two specific instances where OC spray was deployed, he believed that Plaintiff was attempting to assault him through use of bodily fluids, i.e., spit and urine.  Plaintiff, on the other hand, maintains that there was no need for any application of force because he was handcuffed and shackled to a table, he did not attempt to break free of his restraints, and he did not attempt to spit or urinate at Sgt. Chesmer.

While the record is clear that Sgt. Chesmer secured the can of OC spray before entering the day room because he had received a report that inmates were attempting to slip or pull out of

26

their hand restraints, the video does not clearly show the inmates' hands while they were at the tables in the day room and the Court was unable to discern Plaintiff, or any inmate, actively manipulating their hand restraints before Sgt. Chesmer entered with the OC spray in hand. Nevertheless, it was not this alleged manipulation of hand restraints that led to Sgt. Chesmer's deployment of the OC spray in either instance.  Rather, according to Sgt. Chesmer's own written report, it was his belief that Plaintiff was going to break out of his restraints and spit on him that led to his deployment of OC spray in the first instance and his belief that Plaintiff was going to urinate on him that led to his deployment of OC spray in the second instance.  *See* (Sgt. Chesmer's Employee Report of Incident; ECF No. 67-2, p.21) ("The situation escalated even further at which point [Plaintiff] violently attempted to pull off his restraints to assault me. When he appeared to want to spit on me I applied OC.  I ordered him again to take his seat.  He then pulled his penis from his pants in an attempt to urinate on me.  I sprayed OC again and ordered staff members off the pod for safety.")

Unfortunately, neither parties' versions of events can be corroborated by the video in the record.  While it is readily apparent on the video that words are exchanged and that Plaintiff gets agitated at Sgt. Chesmer, and also apparent that Plaintiff eventually stands and yanks at the restraints on his wrists, the Court was unable to discern Plaintiff actively attempt to pull off his restraints or spit at Sgt. Chesmer, which was Sgt. Chesmer's primary justification for the deployment of the OC spray in the first instance.  Additionally, while it is clear on the video that Plaintiff pulled his penis out of his pants before Sgt. Chesmer deployed OC spray in the second instance, whether Plaintiff did so in order to urinate on Sgt. Chesmer also appears to be in dispute.  In fact, during an internal investigation, it was report by the reviewing officer that Plaintiff revealed his penis "with unknown intentions."  (ECF No. 67-2, p.33.)

27

The third <u>Whitley</u> factor requires the Court to consider the extent of the injury inflicted. Plaintiff claims that Sgt. Chesmer's application of OC spray caused an extreme burning sensation and the effects of it lingered in his hair even after he was allowed to take a shower. Counsel for Sgt. Chesmer maintains that Plaintiff only temporarily suffered the effects of the OC spray and he did not sustain any physical injury because the use of the OC spray avoided the need for physical efforts to bring him under control.

Although the Eighth Amendment does not protect inmates against every minimal use of force, it does protect them from the unnecessary and wanton infliction of pain by correctional officers, regardless of whether they suffer serious, permanent injury as a result.  *See* <u>Hudson v. McMillian</u>, 503 U.S. 1, 4 (1992).  Indeed, the Third Circuit has stated that injuries suffered as a result of pepper spray are "not inconsequential" and that the use of such spray on an inmate who poses no imminent threat to staff and inmates may violate the Eighth Amendment.  *See*, *e.g.*, <u>Robinson v. Danberg</u>, 673 F. App'x 205, 212 (3d Cir. 2016).

Under the fourth <u>Whitley</u> factor, the Court must consider the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them.  Here, Sgt. Chesmer maintains that OC spray was utilized against Plaintiff in both instances because Plaintiff posed a threat to the safety of the staff and inmates around him.  He claims that Plaintiff was acting in a very aggressive manner, being loud and unruly, and making threats towards staff and others.  In addition, he claims that Plaintiff was aggressively attempting to break out of his restraints and assault him through use of bodily fluids.

Once again, the video does not have sound, and therefore it cannot substantiate Sgt. Chesmer's contention that Plaintiff was being loud and unruly and making threats towards staff

28

and others.  Furthermore, as previously stated, the Court was unable to discern Plaintiff

aggressively attempting to break out of his restraints and assault Sgt. Chesmer with spit, and

Plaintiff disputes that he attempted to spit or urinate on Sgt. Chesmer, or that he posed any threat

to Sgt. Chesmer whatsoever because he was restrained to the table with both handcuffs and

shackles.  In addition, the Court notes that the officer who investigated the incident concluded

that the initial use of OC spray by Sgt. Chesmer was "borderline" and found that Sgt. Chesmer's

written justification for deploying the OC spray (that Plaintiff appeared to want to spit) to be

"weak."

Finally, under the fifth Whitley factor, the Court must consider whether there were efforts

made to temper the severity of the forceful response.  Sgt. Chesmer maintains that he resorted to

the use of OC spray only after his physical presence (and that of other DOC staff) and several

direct verbal orders failed to gain Plaintiff's compliance.  Again, the video contains no sound,

and, while Plaintiff's version of events does seemingly support the fact that he was told to sit

down, it was also reported as part of the internal investigation that "[p]rior to dealing with the

issue, contact should have been made with a commissioned officer."  (ECF No. 67-2, p.33.)

Additionally, it was reported that a commissioned officer's "presence in initial incident may have

prevented the [deployment of OC spray in the second instance]."  Id.

Applying the five Whitley factors, the Court concludes that there are genuine issues of

material fact as to whether the deployment of OC spray in both instances was reasonably

necessary to maintain or restore discipline under the circumstances.  Viewing the facts insofar as

they are depicted on the video, and the evidence in the light most favorable to Plaintiff, a

reasonable jury could conclude that the deployment of OC spray in both instances was excessive

and that Sgt. Chesmer acted maliciously and sadistically thus violating Plaintiff's Eighth Amendment rights.  Accordingly, summary judgment will be denied on this claim.

**E. <u>Conclusion</u>**

For the aforementioned reasons, Defendants' Motion for Summary Judgment will be granted in part and denied in part.  Specifically, it will be granted as to Plaintiff's claims against Defendants Wetzel and Gilmore and denied as to Plaintiff's Eighth Amendment claim against Sgt. Chesmer.  A separate Order will issue.

Dated:  April 29, 2020.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Jerome Junior Washington
        HV0282
        SCI Greene
        175 Progress Drive
        Waynesburg, PA  15370

        Counsel of record
        (Via CM/ECF electronic mail)